W. JAYE FORD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ford v. Commissioner
Docket No. 24473-81
United States Tax Court
T.C. Memo 1991-354; 1991 Tax Ct. Memo LEXIS 403; 62 T.C.M. (CCH) 293; T.C.M. (RIA) 91354; July 31, 1991, Filed *403 Decision will be entered under Rule 155. W. Jaye Ford, pro se. William R. Leighton, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION The principal issue in this case is whether respondent's determination that petitioner failed to properly report income from various business dealings in 1973 to 1977 is correct. Petitioner has also raised several procedural issues since filing the petition in 1981. Petitioner has been uncooperative with his own counsel, respondent, and the Court during critical stages of the case. As discussed below, we have concluded that the bulk of respondent's determinations are correct, and that the procedural issues raised by petitioner lack merit. Respondent determined the following deficiencies in petitioner's Federal income tax: Additions to Tax
Year
Deficiency
Section 6653(a) [1]
1973
$  21,974
$ 1,099
1974
117,443
5,872
1975
107,663
5,383
1976
58,575
2,929
1977
5,392
270
*404 After concessions, the following issues remain to be decided. 1. Whether the Court's granting of Hank Vanderkam's motion to withdraw as petitioner's counsel was proper where petitioner failed to communicate or cooperate with his counsel before trial. We hold that it was. 2. Whether the Court's decision not to continue the case was proper. We hold that it was. 3. Whether the proceedings should be stayed due to petitioner's prior bankruptcy cases. We hold that it should not. 4. Whether the attorney-client privilege was violated by the testimony of petitioner's former business partner who had also been petitioner's lawyer on unrelated matters. We hold that it was not. 5. Whether respondent's determinations are correct relating to petitioner's income from bank deposits in 1973, 1975, 1976, and two in 1977; from the Milam/Gray property in 1973 and 1976; from Ford Southwest Corporation (Ford Southwest) in 1974, 1975, and 1977; from Walker Southwest Corporation (Walker Southwest) in 1974 and 1975; and from the sale of Slaton Savings and Loan Association stock. We hold that the determinations are correct except as noted in the opinion. 6. Whether petitioner received unreported *405 dividend income from Orange Bank during 1974. We hold that he did not. 7. Whether petitioner is entitled to a theft loss deduction for 1975 or to certain losses from the Sundance Cattle Company Partnership in 1975 to 1977. We hold that he is not, except for certain partnership losses after July 20, 1976. 8. Whether petitioner is liable for additions to tax for negligence under section 6653(a). We hold that he is. 9. Whether petitioner is liable for a penalty under section 6673 where petitioner has failed to cooperate with respondent and failed to comply with Court orders and schedules to produce various documents before and after trial, has maintained groundless positions, and has pursued the case primarily for delay. We hold that he is. FINDINGS OF FACT 1. Petitioner
Petitioner resided in Flatonia, Texas, when he filed his petition. He timely filed joint Federal income tax returns with his former wife, Mary K. Ford, for 1973 through 1977. 2. Procedural Overview of Case
Petitioner's former wife, Mary K. Ford, was also a petitioner in the early stages of this case. However, in 1984, respondent reached a settlement with her as an innocent spouse under *406 section 6013(e) and her case was severed. A letter to the Court from petitioner was filed as an imperfect petition on September 11, 1981. The Court ordered petitioner to file a proper petition. Petitioner filed an amended petition and requested trial at San Antonio, Texas. On March 1, 1982, respondent moved to dismiss for lack of jurisdiction because the petition was filed more than 90 days after the notice of deficiency was mailed. Petitioner filed a response alleging that he was out of the country when the notice of deficiency was mailed. The Court denied respondent's motion to dismiss for lack of jurisdiction. On October 28, 1983, the Court calendared the case for trial on January 23, 1984, at San Antonio, Texas. On November 16, 1983, Richard L. Fuqua, bankruptcy counsel for W. Jaye Ford, filed a notice of bankruptcy alleging that petitioner had filed a petition for relief under chapter 7, title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas. This Court issued an order staying all proceedings in this case. The Court issued seven orders to the parties to file reports as to the status of petitioner's bankruptcy proceedings *407 about every 6 months. Petitioner failed to file any of the reports ordered by the Court. On October 21, 1986, respondent reported that petitioner's discharge was denied. The Court lifted the stay of proceedings. By notice setting case for trial served on October 12, 1988, the Court set the case for trial on March 13, 1989, at San Antonio, Texas. On November 21, 1988, respondent moved for leave to file an answer out of time. The motion stated that respondent had inadvertently failed to answer the amended petition. The Court granted the motion and respondent's answer was filed. On December 9, 1988, the Court ordered petitioner to report his current address for service. On December 22, 1988, Henry P. Vanderkam filed his entry of appearance on behalf of petitioner. At the call of the calendar in San Antonio on March 13, 1989, by another Division of this Court, Mr. Vanderkam orally moved to dismiss and argued that petitioner lacked an opportunity to raise the merits of Federal taxes in the bankruptcy proceedings. Trial and a hearing on this issue were set for March 21, 1989. The Court ordered the parties to provide briefs at trial on this issue. However, the judge recused *408 himself on grounds discovered shortly before the hearing and the case was continued. The trial was later calendared for a session of this Court in Houston. Respondent sent an informal request to petitioner to produce documents, but petitioner did not comply. Respondent filed a motion to compel production of documents. The Court ordered petitioner to file specific objections or to produce the documents. Petitioner failed to comply with the Court's order. At the conclusion of the trial, petitioner withdrew petitioner's exhibits 48 through 80 to enable him to provide copies to respondent and the Court. The Court ordered petitioner to serve copies of the exhibits on the Court and on respondent. The Court also ordered petitioner to submit to the Court copies of documents pertaining to his bankruptcy proceedings. The Court ordered the parties to submit a signed stipulation of facts that reflected the changes agreed to during trial. Respondent prepared the stipulation and forwarded it to petitioner, but petitioner failed to respond. The Court again ordered petitioner to submit to the Court and serve on respondent copies of petitioner's exhibits 48 through 80 and bankruptcy proceedings *409 documents. The Court issued this order because of the possibility that petitioner did not receive the previous order to do these things. Respondent filed a motion to impose sanctions under Rule 104(c) for petitioner's failure to provide the exhibits. The Court entered an order prohibiting petitioner from entering into evidence exhibits 48 through 80. The Court set a briefing schedule for the parties. Respondent filed an opening brief. Petitioner filed no briefs. 3. Withdrawal of Counsel
Petitioner failed to communicate with his counsel regarding his case before trial despite repeated telephone calls and correspondence to him from his counsel (Mr. Vanderkam). Mr. Vanderkam made at least three calls to petitioner's home, four calls to his Houston business, and four calls to his Dallas business. Petitioner returned none of the calls. Mr. Vanderkam sent letters to petitioner's home, but petitioner did not answer them. 4. Bankruptcy
Petitioner's bankruptcy counsel notified this Court on November 16, 1983, that petitioner filed a bankruptcy petition on July 1, 1983, seeking protection under chapter 7, title 11 of the United States Code. Accordingly, this Court *410 stayed these proceedings. Petitioner's discharge was denied. Consequently, we lifted the stay. At a hearing pursuant to a calendar call of this case on March 13, 1989, in San Antonio before a different Division of this Court, counsel for petitioner reported that petitioner had filed a bankruptcy petition under chapter 11 which was converted to chapter 7, and that a discharge was issued by the bankruptcy court on June 16, 1988. As stated above, the Court had initially dismissed the case for lack of jurisdiction. Tax was assessed. The Court later vacated its dismissal order, and the assessment was withdrawn. Petitioner and his bankruptcy counsel apparently believed that withdrawal of the assessment meant the IRS had conceded the case. Petitioner further believed that when the final disposition was made by the bankruptcy court, it may have included the incorrect total amount of Federal income taxes. Petitioner alleges that he believed that the taxes were no longer owing, and that the bankruptcy court did not adjudicate them on the merits or dismiss them as part of the discharge of his indebtedness. The bankruptcy court had jurisdiction to determine petitioner's tax liability. *411 The proof of claim that was filed made no reference to petitioner's Federal income taxes. There was no objection to the proof of claim. Petitioner's counsel indicated that the bankruptcy court reversed its dismissal order and thus may have continuing jurisdiction of the case. At trial, petitioner stated: the proper forum for this proceeding would probably be in a bankruptcy filing. So I think that is all[.] That these proceedings have been stayed by a Chapter 7 proceeding and that probably that is the other objection I have as to proceeding forward.
Petitioner never presented to this Court any documents from his bankruptcy proceedings as he had been ordered and briefs on this issue were never filed. Respondent sought documents from petitioner and served petitioner's counsel with informal discovery, formal discovery, and the Court's order regarding discovery. Petitioner's counsel did not have any of the documents, so he forwarded the requests and order to petitioner. Petitioner did not respond. Petitioner claimed to have called his counsel at least 20 times in response to discovery and to prepare for trial. Petitioner's counsel's office logs all incoming calls. *412 The log show no calls from petitioner to his counsel from April 1, 1989, to October 3, 1989. Mr. Vanderkam sent several itemized bills for legal fees to petitioner. Mr. Vanderkam wrote a letter on May 4, 1989, to petitioner which referred to invoices past due and reminded petitioner that "On Saturday, March 10, 1989, when I asked you to bring your invoices current, you informed me that you would do so immediately." Petitioner made no payment. Petitioner paid a total of $ 500 to Mr. Vanderkam for attorneys fees and costs before April or May 1989, and owed Mr. Vanderkam $ 12,104 for attorneys fees as of August 1, 1989. Six weeks before the start of the trial session for this case, Mr. Vanderkam informed petitioner by certified mail of his intent to withdraw as counsel. Petitioner's counsel took this action immediately after petitioner failed to respond to the time-sensitive discovery material that Mr. Vanderkam had forwarded to him. Petitioner made no apparent effort in the 6 weeks remaining before the trial session to alter his conduct which led his counsel to seek to withdraw, or to obtain other counsel. Petitioner filed a response that generally disagreed with Mr. Vanderkam's *413 allegations. The Court held a hearing on the motion at the calendar call of this case, which was the first time after the motion was made that the Court and the parties were in Houston. The Court granted Mr. Vanderkam's motion. 5. Petitioner's Access to His Records Held by the Texas Department of Banking
First Continental Trust, an entity owned or run by petitioner, closed on November 1, 1988. The Texas Department of Banking seized all of First Continental Trust's records and moved them to Austin, Texas. The records have always been available to petitioner for inspection and copying. Petitioner and his attorneys have inspected them. At the San Antonio calendar call in 1989, petitioner and his counsel appeared with a box of documents. After the trial was continued, they decided to organize them better and mail them to respondent's counsel. However, Mr. Vanderkam returned the records to petitioner because much of the information needed to be better assembled. Petitioner was most knowledgeable as to these matters, and he agreed to assemble the documents. Petitioner did not assert that documents he needed were in possession of the Texas Department of Banking when the *414 case was scheduled for trial in San Antonio, a date after various records had been seized by the Texas Department of Banking. However, at a later hearing in Houston, petitioner claimed that Mr. Vanderkam and the Texas Department of Banking had all of his records. At trial the Court gave petitioner permission to contact the Texas Department of Banking to obtain copies of records to supplement the record. Petitioner did not supplement the record. 6. Sources of Deposits
Petitioner had knowledge of some but not all of the deposits to his former wife's account. The source of the February 23, 1973, $ 9,500 deposit at the Orange Bank was Dibold Industries (Dibold). The source of the December 31, 1975, $ 8,000 deposit at the First National Bank of Schulenberg was Dibold Development Corporation. The source of the June 7, 1976, $ 2,000 deposit at the First National Bank of Schulenberg was Mr. W. R. Moore. The source of the $ 2,000 deposit on July 29, 1976, at the First National Bank of Schulenberg was Oak Forest Auto Service. The sources of the January 1977 deposits to the North Central Bank are Charles R. Gary in the amount of $ 9,915.45, and Sundance Cattle Company (Sundance, *415 Inc.) in the amount of $ 1,500. The source of the $ 2,000 deposit in October 1977 at the First National Bank of Schulenberg is Nancy Lee Duckett. The parties stipulated that the $ 450 deposit at the First National Bank of Schulenberg in December 1977 is not taxable income. 7. Milam/Gray Property
Petitioner purchased the Milam/Gray property from Raymond I. Arsht, William E. Ladin, and Leopold Meyer on July 6, 1974, for $ 380,000. The Milam/Gray property was a parking lot in Houston rented by Ampco Parking Systems in all of the years at issue. Petitioner borrowed the $ 380,000 he used to purchase the Milam/Gray property from Orange Bank. On July 6, 1974, he executed a deed of trust giving Orange Bank a first lien to secure the $ 380,000 note. Petitioner sold the Milam/Gray property to Fred T. Morgan, Trustee, by a warranty deed dated April 4, 1974, and recorded April 11, 1974. In return, he received a $ 535,000 promissory note from Fred T. Morgan, Trustee, dated April 4, 1972, as part of the consideration for the sale. On April 8, 1974, petitioner borrowed an additional $ 450,000 from Orange Bank. On the same day, he executed a collateral assignment and security agreement *416 pledging the $ 535,000 note from Fred T. Morgan, Trustee, to the Orange Bank as security for the repayment of petitioner's $ 450,000 note to Orange Bank. On April 16, 1974, a release of the deed of trust from petitioner securing the original $ 380,000 note to Orange Bank was recorded. Petitioner caused a financial statement dated April 10, 1974, to be prepared on his behalf, which is entitled W. JAYE FORD FINANCIAL STATEMENT, DECEMBER 31, 1973. The financial statement includes the Milam/Gray property at a value of $ 880,000. He did not report his sale of the Milam/Gray property on his Federal income tax returns during any of the years at issue. Petitioner received but did not report rental income on the Milam/Gray property in the amount of $ 19,800 in 1973. He reported $ 8,050 in rental income from the Milam/Gray property for 1974. Petitioner owned that property for 6 months during 1974. 8. Ford Southwest
During the years 1973 through 1977, petitioner owned at least 60 to 70 percent of the stock in Ford Southwest, a Texas corporation. Petitioner was the president of Ford Southwest throughout its existence. Ford Southwest made distributions in 1974 to petitioner *417 or for his benefit as follows: DATE
AMOUNT
6/20
20,000
7/18
5,000
7/24
20,000
7/29
20,000
11/11
$ 12,000
TOTAL
$ 77,000
Petitioner made payments to Ford Southwest in 1974 totaling $ 37,058.60. In 1975, Ford Southwest made distributions to petitioner or for his benefit as follows: DATE
AMOUNT
1/31
$ 34,500
12/31
1,000
TOTAL
$ 35,000
Petitioner made payments to Ford Southwest in 1975 in the total amount of $ 28,200. In 1977, petitioner's withdrawals from Ford Southwest exceeded his payments to Ford Southwest by $ 17,300. 9. Walker Southwest
Petitioner received distributions from Walker Southwest of $ 40,000 on October 28, 1974, and $ 95,000 on December 31, 1984. Petitioner made no contributions to Walker Southwest in 1974. In 1975, petitioner received $ 157,500 more in distributions from Walker Southwest than the amount he contributed to Walker Southwest. 10. Orange Bank
Petitioner owned an interest in Orange Bank during 1974. He received and reported a $ 1,999 dividend from Orange Bank during 1974. 11. Sundance Cattle Company
Sundance Cattle Company was incorporated on January 21, 1975, under Texas law. It was *418 in the business of raising and selling cattle. Petitioner was a shareholder in Sundance, Inc., throughout 1975, 1976, and 1977. A partnership agreement was executed on July 20, 1976, stating that Sundance, Inc., was a partner in the Sundance partnership. No partnership agreement regarding Sundance, Inc., was entered into before July 20, 1976. However, petitioner reported a $ 21,469.08 loss from the Sundance partnership in 1975, $ 41,004.28 for 1976, and a $ 26,147 loss in 1977. The differences between Sundance, Inc., and Sundance partnership were unclear to those doing business with them. There is no documentary evidence of the transfer of real or personal property from Sundance, Inc., to the Sundance partnership after the partnership began the cattle operation previously operated by the corporation. Parties dealing with Sundance did not know if they were dealing with the partnership or the corporation. 12. Slaton Savings and Loan Association
In the spring of 1972, Frank Young owned 7,500 of the 10,000 outstanding Slaton Savings and Loan Association (Slaton S & L) shares. Petitioner began negotiating for the purchase of Mr. Young's Slaton S & L shares early in 1972. *419 Mr. Miller began acting as petitioner's attorney in 1970 or 1971. Mr. Miller's involvement with Slaton S & L began when petitioner approached him in the spring of 1972 to ask if he was interested in purchasing a savings and loan in Slaton, Texas. Mr. Miller did not represent petitioner as an attorney in connection with the acquisition of Slaton S & L. Mr. Miller's relationship with petitioner and a third partner, Raymond Hill, was as a joint venturer. Mr. Miller did not bill petitioner and petitioner did not pay any legal fees to him concerning the Slaton S & L transaction. Petitioner proposed to Mr. Miller that the stock be in Mr. Miller's name. Petitioner would arrange for the financing of the acquisition, and that the eventual profit on the sale be split 50/50 between petitioner and Mr. Miller. Mr. Miller had no experience in the banking or savings and loan industry prior to his involvement with Slaton S & L. Acting on behalf of petitioner as his trustee, Mr. Miller purchased the 7,500 shares of stock in Slaton S & L (comprising 75 percent of the outstanding shares) on July 13, 1972, from Mr. Frank Young. The terms of the July 13, 1972, sale included payment of $ 500,000 *420 cash and a $ 381,000 note to Mr. Young. The $ 500,000 down payment was financed by Orange Bank, which received a first lien on the 7,500 shares. Mr. Miller had no banking relationship with Orange Bank before obtaining the $ 500,000 loan from Orange Bank. The $ 381,000 note to Frank Young was executed by Edward T. Miller, Trustee, and was guaranteed by petitioner. Mr. Young was given a second lien on the 7,500 shares of Slaton S & L stock as security for his $ 381,000 loan. On August 22, 1973, Mr. Miller obtained a $ 1 million loan from Fannin Bank in Houston. The loan was guaranteed by petitioner. Of the $ 1 million loan, $ 500,000 was used to pay the $ 500,000 note at Orange Bank, $ 250,000 was left in a certificate of deposit at Fannin Bank in petitioner's name, and the remaining $ 250,000 was put in a certificate of deposit owned by petitioner at a bank in Lubbock, Texas. In the spring of 1974, Mr. Miller was concerned that Mr. Young had not been paid on his $ 381,000 note, and thus decided to attempt to sell the Slaton S & L stock. Mr. Miller negotiated the sale of the Slaton S & L stock in the spring of 1974 with Jerry Powell and Jack Gaulding and closed a deal regarding *421 the sale of the stock on May 30, 1974. Before the sale of the stock to Jerry Powell and Jack Gaulding, it split 10 for 1. The purchase price of the 75,000 (7,500 X 10) shares of Slaton S & L stock to Powell and Gaulding was $ 1,433,330, with $ 400,000 down and a note for $ 1,033,330. The $ 1,033,330 note called for $ 500,000 to be paid on January 31, 1975, which was put in a certificate of deposit maturing on such date, with the remainder in 10 equal annual installments beginning May 31, 1975. Mr. Miller advised petitioner of his negotiations with Powell and Gaulding and petitioner agreed to the sale on those terms. On May 30, 1974, Mr. Miller borrowed $ 1,033,330 from Fannin Bank, which was used to pay the earlier $ 1 million Fannin Bank note. Mr. Miller also pledged the $ 1,033,330 note from Powell and Gaulding to Fannin Bank as security for the new note. Petitioner guaranteed the $ 1,033,330 note from Mr. Miller to Fannin Bank. The $ 400,000 down payment from Powell and Gaulding was wired to an account set up by petitioner in Mr. Miller's name at Fannin Bank. Out of the $ 400,000, $ 300,000 was deposited into the Ford Southwest account and $ 74,152.78 was paid to Fannin *422 Bank as interest on the $ 1 million note. On June 1, 1974, Mr. Miller assigned his interest in the Powell and Gaulding note to petitioner in return for a $ 200,000 note from petitioner and petitioner's agreement to discharge Mr. Miller from his indebtedness to the Fannin Bank for $ 1,033,330, and to Mr. Young on the original $ 381,000 note. Petitioner never made any payments to Mr. Miller on the $ 200,000 note. In January 1974, Slaton S & L declared a dividend and Mr. Miller received $ 37,500, of which Miller paid $ 25,000 to petitioner. Mr. Young recovered a $ 315,000 judgment against petitioner regarding petitioner's failure to pay the $ 381,000 note, and collected a total of $ 381,090 from petitioner on the judgment. In late 1974, Powell and Gaulding filed a suit against petitioner and Mr. Miller, styled Slaton Savings and Loan Association, et al v. Edward T. Miller, et al, No. 78,326, 140th District Court in and for Lubock County, Texas, claiming fraud and misrepresentation in the sale of the Slaton S & L stock. Fannin Bank later entered the suit because it held the Powell and Gaulding note as security for the $ 1,033,330 note. Fannin Bank agreed to be dismissed from *423 the suit for a payment of $ 850,000. In 1976, Mr. Young interpleaded into the lawsuit. On February 17, 1978, a final settlement was issued in Mr. Ford's favor in the amount of $ 330,000. The court directed that $ 100,000 of the $ 330,000 be retained by Mr. Ford and $ 230,000 be directed to Mr. Young. OPINION Petitioner failed to file posttrial briefs. Although we have held it appropriate to dismiss the case under similar circumstances, , affd. without published opinion , here we have instead sought to address the issues petitioner raised at trial and throughout the long history of this case. 1. Withdrawal of Petitioner's Counsel
Mr. Vanderkam moved under Rule 24(c) to withdraw as petitioner's counsel 6 weeks before the calendar call of this case. Mr. Vanderkam's grounds were that petitioner failed to communicate and cooperate in preparing his case for trial and failed to pay legal fees. Rule 24(c) provides for withdrawal of counsel of record at the Court's discretion. A motion under Rule 24(c) poses an issue of practice and procedure which is within the Court's *424 jurisdiction. . In considering a motion under Rule 24(c) we must balance the interests of petitioner, respondent, the attorney seeking withdrawal, and the Court. . Petitioner claimed that he returned Mr. Vanderkam's telephone calls and called Mr. Vanderkam more than 20 times in the weeks preceding trial. Petitioner also alleged that Mr. Vanderkam had petitioner's documents except those documents held in Austin by the Texas Department of Banking. Petitioner further claimed that he made payments to Mr. Vanderkam but was unable to contact Mr. Vanderkam to discuss his bill. After review of the record, we find that Mr. Vanderkam was forthright and credible, and that petitioner's contentions are not credible or persuasive. Petitioner was uncooperative with his counsel. Logs from Mr. Vanderkam's law offices show that Mr. Vanderkam made three calls to petitioner's home, four to his Houston business, and four to his Dallas business, but none were returned. The logs also show that petitioner did not place any calls to Mr. Vanderkam's office from at least April 1, *425 1989, to October 3, 1989. Mr. Vanderkam sent two letters to petitioner at home, but they were unanswered. We have found that Mr. Vanderkam returned petitioner's documents to petitioner on March 21, 1989. As a result, Mr. Vanderkam did not have documents relating to respondent's discovery requests. Petitioner's effort to blame his counsel for this failure to reply to discovery is farfetched at best. Mr. Vanderkam made reasonable efforts to inform petitioner about his bills for legal services. The last balance due was $ 12,104. Petitioner paid a total of $ 500. Failure to pay attorneys fees may be grounds for withdrawal of counsel. . Mr. Vanderkam forwarded respondent's discovery requests to petitioner. Petitioner acknowledged receiving some information from Mr. Vanderkam, but denied knowing what it was. We find petitioner's claims to be evasive and self-serving, in light of his extensive business experience and aptitude. We note that petitioner has no absolute right to counsel in this civil case. . See , *426 affg. ; , affd. without opinion . We have reviewed the record and evaluated petitioner's statements and arguments. We have considered the conduct of all parties, and their respective interests. On balance, we conclude that when it became clear that petitioner was not going to cooperate or communicate with or pay Mr. Vanderkam, Mr. Vanderkam appropriately notified petitioner of his intention to withdraw as counsel. We also conclude that the Court properly granted the motion by petitioner's counsel to withdraw from the case. We note that , decided by the United States Court of Appeals to which an appeal of this case would be taken, concluded that the trial court had not shown sufficient reason to dismiss with prejudice a civil case where a plaintiff discharged her counsel on the eve of trial. Although we did not apply the "extreme sanction" of dismissal as in , we believe the Court's reasoning in McNeal supports our *427 denial of a continuance. Many factors distinguish this case from McNeal. For example, in McNeal, the Court of Appeals took into account that (1) there were unrefuted charges that the discharged attorney had not kept his client McNeal informed, . In contrast, in the instant case Mr. Vanderkam attempted to keep petitioner informed, but petitioner failed to respond to Mr. Vanderkam's repeated attempts to communicate; and that (2) McNeal obtained new counsel after the dismissal of the case, . Petitioner has not obtained new counsel. Unlike McNeal, we did not dismiss the case. Instead, we allowed petitioner to proceed, to offer evidence, to testify, call and examine witnesses, and to raise numerous procedural issues. In the instant case, petitioner knew the trial date was approaching during the time he was refusing to respond to his counsel's communications, including those relating to discovery, and was refusing to discuss his counsel's bills. He also knew his counsel had returned his records to him after the San Antonio session. He knew of his counsel's intention to withdraw 6 weeks before trial. We think *428 petitioner knew his actions would lead to withdrawal of his counsel. Petitioner was himself responsible for Mr. Vanderkam's withdrawal. The following statement many years ago from the Supreme Court of South Carolina in a case involving dismissal of a lawyer by a client is appropriate here: "If a party to an action can force a continuance by the willful discharge of his attorney just before the time for trial, and then secure a continuance, there would be no way in which the trial of a case can be forced." . Petitioner did not respond to pretrial contacts from his counsel related to trial preparation or to payment of his counsel. Petitioner falsely criticized his counsel in the process. We do not believe it is fair to respondent or appropriate to judicial administration to allow petitioner to bootstrap his way to a continuance in this fashion. Petitioner also sought a continuance on the grounds that he was not given access to his records at the Texas Department of Banking. We disagree with his claim that he was denied access. He was not only given access, but, about a month before trial, he *429 and his attorneys actually physically inspected his records that were in the custody of the Texas Department of Banking. Also, at a prior setting of this case for trial, petitioner did not claim any problem with access to records even though the Texas Department of Banking had already seized some of them. We conclude that petitioner's claim of lack of access to his records is contrary to the facts and is no basis for a continuance. 2. Bankruptcy
Petitioner has referred to a bankruptcy issue but he failed to respond to an order of this Court to provide posttrial briefs and documents relating to his bankruptcy. Petitioner's prior counsel had orally moved to dismiss on bankruptcy-related grounds. The motion was denied without prejudice because the issue had not been sufficiently developed. The motion to dismiss was not renewed; however, petitioner cited his bankruptcy as grounds for objecting to the proceedings. Respondent alleged that the automatic stay had been lifted as a matter of law. Petitioner was ordered to provide copies of all pertinent documents concerning his bankruptcy proceedings relevant to his individual Federal income taxes but he never did so. Petitioner *430 has failed to show any basis for us to rule that we do not have jurisdiction. 3. Attorney-Client Privilege
Respondent called Mr. Miller as a witness to testify as to the purchase of Slaton S & L. Petitioner objected on grounds of attorney-client privilege. The attorney-client privilege protects confidential communications between a client and an attorney. ; ; C. McCormick, Evidence, sec. 91, pp. 217-221 (3d ed. 1984). The privilege protects confidences given to attorneys acting in their capacity as attorneys. ; . The person who claims the privilege has the burden of showing that it applies. ; Here, petitioner made a blanket claim of privilege but did not convince us that the testimony would relate to the securing of legal advice as distinguished from business advice and dealings of Mr. *431 Miller and petitioner in a business partnership. Mr. Miller had represented petitioner as a lawyer at times beginning in late 1971. Petitioner asked Mr. Miller if he was interested in buying a savings and loan. Mr. Miller had a business relationship with petitioner relating to Slaton S & L as one of three coowners of it. Mr. Miller testified that he did not represent petitioner as a lawyer with respect to the purchase of Slaton S & L. Petitioners testified to the contrary, but we find Mr. Miller's explanation to be more credible. Accordingly, we hold that Mr. Miller's testimony is not barred by the attorney-client privilege. 4. Unidentified Bank Deposits -- Sources of Deposit
Respondent determined that petitioner received unreported income in the amounts of $ 78,702, $ 27,166, $ 38,001, $ 4,100, and $ 13,865, for 1973 through 1977, respectively, derived from unidentified bank deposits specified in a schedule attached to the notice of deficiency. Section 61 provides that gross income includes all income from whatever source. These deposits are includable in gross income unless they can be shown to be nontaxable. , *432 affd. ; . Respondent conceded that the $ 450 deposit to the First National Bank of Schulenberg in December 1977 is not additional taxable income. Petitioner testified with respect to a $ 22,000 deposit on August 26, 1975. Petitioner alleged that he purchased an antique automobile from Jeff Botts, and then returned the car to Mr. Botts and received a $ 22,000 refund. However, neither the deposit slip, the underlying check, nor any other documentary evidence corroborating petitioner's explanation was introduced into evidence. The parties stipulated to the underlying documentation (i.e., deposit slips and checks deposited) regarding several other deposits at issue. Petitioner's explanations of the stipulated deposits are uncorroborated and unconvincing. Moreover, petitioner testified that the $ 2,000 deposit to First National Bank of Schulenberg on October 7, 1977, was actually petitioner cashing a check written by petitioner's mother-in-law, Nancy Lee Duckett, and providing her with the cash. The evidence shows the deposit was made. However, there is no evidence corroborating *433 his statement that he gave the $ 2,000 in cash to Mrs. Duckett. With regard to the $ 2,100 deposit on July 29, 1976, at the First National Bank of Schulenberg, petitioner explained that he purchased a 1937 Ford truck from his neighbor and then sold it to Oak Forest Auto Service for the same amount. However, petitioner offered no documents or other evidence to corroborate his story. Petitioner next discussed the two deposits from Dibold, namely the $ 9,500 deposit to Orange Bank on February 23, 1973, and the $ 8,000 deposit to the First National Bank of Schulenberg on December 31, 1975. During his direct testimony, petitioner testified that he sold Dibold to some individuals from Dallas who did not want to pay the entire purchase price in the year of sale, and therefore, they issued a $ 25,000 note from Dibold to petitioner, but funded only $ 9,500, and sent petitioner a Form W-2 each year for $ 3,000. On cross-examination, petitioner testified that Dibold lent him $ 9,500, and then forgave $ 3,000 per year. Petitioner also testified that he sold Dibold to another company. Petitioner offered no corroborating evidence, and petitioner's explanation is contradictory. Petitioner *434 was unable to credibly explain the nature of these deposits. Numerous unidentified deposits were included in the notice of deficiency, but petitioner addressed only a few. Petitioner's testimony with regard to these deposits is uncorroborated and unconvincing. We hold that petitioner has failed to meet his burden with regard to any of the disputed unidentified deposits. ; Rule 142(a). Thus, respondent's determinations with respect to the deposits other than the one conceded are sustained. 5. Capital Gain on the Sale of the Milam/Gray Property
Respondent determined that petitioner purchased the Milam/Gray property for $ 375,000, and sold it in 1974 to Fred Morgan and Richard King for $ 920,000. Respondent additionally determined that only $ 599,371.95 of the $ 920,000 was paid, and that it was paid in 1976. Respondent determined that petitioner received a $ 224,371.95 capital gain on the sale of the property in 1976 ($ 599,371.95 less $ 375,000). Petitioner failed to report the sale. Respondent concedes that the original purchase price of the Milam/Gray property was $ 380,000 rather than $ 375,000. Petitioner *435 also admits that his basis in the property was $ 380,000. There is also no dispute that petitioner sold the property in 1974 to Morgan and King. Petitioner testified that at the time of the sale in 1974, he obtained a new note at Orange Bank in the amount of $ 450,000, which refinanced the original $ 380,000 note plus accrued interest. Petitioner then pledged the Morgan and King note, in the amount of $ 535,000, to Orange Bank to secure payment of the $ 450,000 note. Petitioner testified that he received an additional note from Morgan and King in the amount of $ 116,000. Petitioner does not dispute that Morgan and King paid $ 599,371.95 regarding the notes in 1976. Although petitioner denied that the sales price was $ 920,000, the amount of the actual sale is immaterial since respondent used $ 599,371.95 to calculate the amount of the gain. Petitioner's testimony supports respondent's determination. Petitioner testified that the $ 116,000 note received on the sale was pledged as collateral to Mr. Young on the Slaton S & L transaction. Petitioner then explained that the Milam/Gray sale did not result in a taxable gain as follows: In the * * * summation of facts, they *436 say [$ ]599,371.95 was paid on such property, and that could be true. But, again, the property went to pay off the [$ ]450 [$ 450,000 note] plus interest and the note that Mr. Young had. And the [$ ]599 figures, I will take their word that that is the correct figure, but the [$ ]599 would have gone to pay the [$ ]535 plus interest. And out of the [$ ]599, [$ ]450 plus interest would have gone to Orange Bank, and the balance of it would have gone on the note, whatever they could have settled out with Frank Young. I never received any money. I only paid out money on the transaction -- didn't bring [$ ]920 -- brought [$ ]535, and still, those funds went to pay a loan on a note that I had guaranteed and had not received the funds for. So I don't believe that that is entitled to claim income from that transaction.
Petitioner's basis in the Milam/Gray property was only $ 380,000, even though he subsequently refinanced the original note. His gain on the sale of property is based upon the amount realized and the basis. Furthermore, the fact that the $ 116,000 note was used by petitioner on an unrelated venture does not change the fact that petitioner received $ 116,000 on *437 the Milam/Gray transaction. Respondent's determination of petitioner's gain on the sale of the Milam/Gray property is supported by petitioner's testimony. Petitioner does not believe that he recognized a gain on the transaction because part of the proceeds was invested in an unrelated transaction and part of the proceeds were used to pay interest on the underlying loan, for which, incidentally, petitioner claimed an interest expense deduction. However, based on the testimony and documentary evidence in the record, respondent's determination is sustained for this issue. 6. Unreported Rental Income from the Milam/Gray Property
The Milam/Gray property was a parking lot which was rented to Ampco Parking Systems during 1972, 1973, and 1974. Petitioner reported $ 7,000 rental income from Ampco during 1974, and none for 1973. Petitioner owned the property until April 1974. Petitioner argues that the rental income was paid to former owners. He testified that he did not receive the money; however, he owned the property during 1973. His financial statement for the end of 1973 includes the Milam/Gray property as an asset with a yearly income of $ 19,800. Petitioner owned the *438 underlying property, the property was generating revenue in excess of respondent's determination, and petitioner reported the revenue in 1974. Based on the evidence presented, respondent's determination with regard to the unreported rental income is sustained. 7. Unreported Dividend Income from Orange Bank
Respondent determined that petitioner did not report dividend income of $ 1,999 from Orange Bank in 1974. Petitioner was ordered by the Court to produce his bank records in response to respondent's motion to compel production of documents. Petitioner did not comply with the Court's order, and produced no evidence other than his testimony that he had reported this income. Respondent asserts that petitioner has not met his burden of proof with regard to the receipt of the dividend because petitioner did not know the number of Orange Bank shares owned by him, or the dividend paid per share. However, on Schedule B of his 1974 return petitioner did include $ 1,999 of dividend income from the payor determined by respondent. Thus, the dividend included in the notice of deficiency was reported for 1974. We find that petitioner reported the $ 1,999 dividend from Orange Bank. *439 8. Unreported Capital Gains Distributions from Ford Southwest
Respondent determined that more funds went from Ford Southwest to petitioner than went from petitioner to Ford Southwest in each of the years 1974, 1975, and 1977. Respondent determined that the excess distributions were taxable subject to the provisions of section 301. During 1974, $ 77,000 was distributed from Ford Southwest to petitioner, while $ 37,058.60 went from petitioner to Ford Southwest. In 1975, $ 35,500 was distributed from Ford Southwest to petitioner, while $ 28,200 went from petitioner to Ford Southwest. During 1977, distributions from Ford Southwest to petitioner exceeded payments by petitioner to Ford Southwest by $ 17,300. Petitioner does not dispute that such money actually left the corporation. Instead, he disputes the taxability of the distributions. The only evidence in the record addressing this issue is petitioner's testimony that excess distributions are not taxable. Respondent attempted to obtain the books and records of Ford Southwest through discovery. Petitioner was ordered to produce the records, but he never did so. Petitioner agreed during the first day of trial to attempt *440 to obtain such records from the Texas Department of Banking prior to the continuation of the trial the following week, but he made no attempt to obtain them. Petitioner has the burden of proof with regard to this issue. ; Rule 142(a). At trial, petitioner stated that he could not produce the requested records because they had been taken by the Texas Department of Banking. Representatives of the Texas Department of Banking, as well as the testimony of petitioner's attorney with regard to the Texas Department of Banking, indicated that even if the records were seized by the banking department, petitioner was given access to them and could have copied them. Petitioner and his bankruptcy attorney actually did inspect the records about a month before trial. Petitioner was always given reasonable access to the records. Accordingly, we do not excuse petitioner for not producing the records. Petitioner's testimony that such distributions were used to pay interest on various notes is uncorroborated. Respondent determined that the excess distributions in the amounts of $ 39,941 for 1974, $ 7,300 for 1975, and $ 17,300 for 1977 were taxable *441 distributions subject to section 301. Pursuant to section 301(c), corporate distributions are treated as dividends to the extent of the corporation's earnings and profits, and then as a return of basis to the extent of the shareholder's basis in the corporation, and then as a gain from the sale or exchange of property (i.e., capital gain distribution). Respondent determined that Ford Southwest had no earnings and profits and that petitioner had no basis in Ford Southwest, and thus treated all distributions as capital gains. Since Ford Southwest was formed in June 1974, the distributions in that year were short-term capital gains. Sec. 1222. The distributions in 1975 and 1977 were treated as long-term capital gains. Petitioner did not dispute that distributions were made. He testified that the distributions were not taxable but provided no corroboration for his testimony. Accordingly, we sustain respondent's determination on this issue. 9. Unreported Capital Gains from Walker Southwest
This issue is identical to the issue regarding the unreported capital gains distributions from Ford Southwest discussed above. Petitioner does not dispute the fact that such amounts *442 actually left the corporation. Instead, he disputes the nature of the distributions. Petitioner failed to produce the books and records of Walker Southwest, although ordered to do so by this Court. Petitioner's uncorroborated testimony is insufficient to meet his burden. Accordingly, respondent's determination with regard to the unreported capital gains distributions from Walker Southwest is sustained. 10. Losses from the Sundance Cattle Company Partnership
Respondent determined that petitioner was not entitled to the losses from the Sundance Cattle Company Partnership in the amounts of $ 21,469 for 1975, $ 44,490 for 1976, and $ 26,147 for 1977, on the theory that no partnership was ever formed and there was no transfer of assets from Sundance to the partnership. Sundance Cattle Company was incorporated under Texas law on January 21, 1975, to operate a cattle raising business. Although petitioner testified that the Sundance Cattle Company partnership was formed in March 1975, the partnership was not formed until July 20, 1976. Although the record is not clear regarding the specific steps taken to transfer the operation of the corporation to the partnership, respondent *443 concedes that there was a valid partnership after July 20, 1976. Thus, petitioner is entitled to the $ 26,147 partnership loss claimed in 1977 and is entitled to a pro rata portion of the 1976 loss (i.e., from July 20, 1976). The evidence establishes that the partnership was not formed until July 20, 1976. First, the partnership agreement is dated July 20, 1976, and makes no reference to a prior agreement. The document is the original partnership agreement. Second, the letter written by petitioner's secretary states that as of May 17, 1976, no partnership agreement had +been prepared. Although petitioner testified that a partnership agreement for the Sundance Cattle Company partnership was prepared prior to the July 20, 1976, partnership agreement, such assertion was not only uncorroborated, but also refuted by documentary evidence. In light of the foregoing, petitioner is not entitled to the 1975 loss. The 1976 loss must be recalculated on a pro rata basis with July 20, 1976, as the relevant date. 11. Theft Loss Deduction
Petitioner offered no evidence substantiating the theft loss. There is no evidence corroborating that a theft occurred, or the nature, value and *444 cost of any items stolen. Sec. 6001; Rule 142(a). Petitioner has failed to carry his burden of proof to substantiate this deduction. 12. Gain from Sale of Stock of Slaton Savings and Loan Association
The Slaton S & L stock issue presents a question of substance versus form. Although the stock of Slaton S & L was held in the name of Mr. Miller, respondent asserts that petitioner was the actual owner of the Slaton S & L stock and that petitioner benefited from the sale of such stock. We agree. We find that petitioner was, in substance, the owner of the Slaton S & L stock, and petitioner, in substance, benefited from the sale of the stock. Petitioner testified that he was not the owner of the stock and, at most, held an option to purchase the shares. Mr. Young stated that he believed he was selling the stock to petitioner. The statement signed by petitioner upon the closing of the purchase states that Mr. Miller was acting on petitioner's behalf. Petitioner also guaranteed the financing used to purchase the stock. We believe petitioner offered his guarantee to protect his investment. Furthermore, petitioner admitted that he was given $ 250,000 from the proceeds of *445 the $ 1 million borrowed from Fannin Bank. The only explanation for this distribution is that petitioner was in substance the owner of the stock. Mr. Miller testified that the Slaton S & L deal was meant to be a 50-50 deal with petitioner. Petitioner gave Mr. Miller a personal promissory note for $ 200,000 which petitioner admitted in a later State court lawsuit represented one-half of the profit on the sale of the Slaton S & L stock. However, petitioner never paid Mr. Miller any part of the $ 200,000 note. This indicates that petitioner owned all of the Slaton S & L shares in dispute, and petitioner enjoyed all of the financial benefits from the transaction. We find that petitioner was financially involved in the purchase and sale of the Slaton S & L stock and was entitled to at least one-half of the proceeds from the sale. Petitioner actually enjoyed the full financial benefits from the sale, and should be treated as the owner of the stock for tax purposes. *446 . In determining that petitioner was the true owner of the Slaton S & L stock, respondent calculated petitioner's gain on the sale, taking into consideration the terms of the sale documents and the amounts paid on the underlying obligations. Respondent also determined petitioner's interest income and expenses associated with the Slaton S & L transaction, assuming that petitioner was the actual owner. The calculations of the gain on the sale and the interest income and expense as determined in the notice of deficiency are set forth below. *447 CALCULATION OF GAIN ON SALE:
Total sales price (per contract)
$ 1,433,330.00
Total basis (see below)
*869,605.00
Gain on sale
563,725.00
Gross profit percentage
39.1133
1974:
Total moneys received
$  400,000.00
Gross profit percentage
39.33
percent
Long-term capital gain - 1974
157,320.00
1975:
Total moneys received
$   850,000.00
Less amount representing interest
income (see below)
81,977.00
Principal received
768,023.00
Gross profit percentage
39.33
percent
Long-term capital gain - 1975
302,063.00
1978: Included for informational purposes only as this year was
not included in the notice of deficiency at issue.
Total moneys received
$   330,000.00
Less amount representing interest
64,693.00
Principal received
265,307.00
Gross profit percentage
39.33
percent
Long-term capital gain - 1978
104,345.00
Total Basis:
Orange Bank note (cash down payment)
$   500,000.00
Payments to Frank Young on the
$ 381,000 note
*369,605.00
Total basis
869,605.00
Calculation of interest income:
Face value of Lubbock C.D.
$   500,000.00
Interest rate
8.5
percent
Interest for one year
42,500.00
Interest for 246 days (maturity date)
28,644.00
Face value of installment note
$   533,330.00
Interest rate
10.00
percent
Interest earned for 1975
53,330.00
Interest on C.D.
$   28,644.00
Interest on installment note
53,333.00
Total interest earned -- 1975
81,977.00
Interest expense:
1974 interest paid regarding
Slaton financing
$   74,152.78
1975 interest paid regarding
Slaton financing
$   129,184.25
The evidence developed at trial differed from the assumptions underlying respondent's calculations in that petitioner actually paid $ 381,090 to Mr. Young on the original indebtedness, instead of $ 369,605, and therefore, petitioner's basis in the stock is slightly higher, which in turn will reduce the gross profit percentage and the capital gain income slightly. 13. Negligence
Respondent determined that petitioner was liable for the addition to tax for negligence, pursuant to section 6653(a). Petitioner has offered no evidence to rebut the presumption of correctness attributed to respondent's determination. Rule 142(a). Petitioner's failure to report large sums of money received by him, as evidenced by the unidentified deposits, petitioner's failure to report the sale of the Milam/Gray property, petitioner's failure to report the Milam/Gray rental income, petitioner's treatment of the Sundance Cattle Company "partnership," and petitioner's unsubstantiated theft loss deduction claim *448 were negligent or made with an intentional disregard of applicable rules and regulations. Accordingly, respondent is sustained on the imposition of additions to tax for negligence. 14. Section 6673 Damages
The final question is whether damages (now called a penalty) under section 6673 should be awarded to the United States. This issue was raised in respondent's brief and in a separately filed posttrial motion. Respondent bears the burden of proof on this issue. Rule 142(a). At the time of trial, section 6673 provided that when it appears to the Court that proceedings before it have been instituted or maintained by the taxpayer primarily for delay, or that the taxpayer's position in such proceedings is frivolous or groundless, damages in an amount not in excess of $ 5,000 shall be awarded to the United States. Petitioner failed to respond to respondent's informal and formal discovery, including motion to compel production of documents and motion to compel responses to respondent's interrogatories. He ignored this Court's orders and Rules of Practice and Procedure, both in the preparation of this case for trial and after the trial. Petitioner ignored Court orders compelling *449 the production of documents, and then sought to introduce documents allegedly received the night before trial. Petitioner caused his counsel to withdraw by failing to communicate, cooperate, and pay legal fees. Additionally, petitioner failed to serve respondent with copies of several exhibits conditionally admitted into evidence, in violation of this Court's orders. The Court also ordered the parties to submit a signed stipulation of facts that reflected the changes agreed upon during trial. Although respondent prepared and forwarded the stipulation to petitioner, petitioner failed to respond. The Court ordered the parties to file briefs, but petitioner did not do so. Petitioner has treated the Court, respondent, his own former counsel, and the judicial process with scorn. He has taken groundless positions and brought and pursued this action primarily for purposes of delay. Accordingly, we hold that petitioner is liable for damages under section 6673 in the amount of $ 5,000. To reflect concessions, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory section references are to the Internal Revenue Code in effect for the taxable years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Should be $ 381.090.↩